UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  7/31/18
```

ROBERT W. JOHNSON,

   Plaintiff,

  -against-

COMMISSIONER OF SOCIAL SECURITY,

   Defendant.

17-CV-5598 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

 Plaintiff Robert Johnson brings this action pursuant to § 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. § 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Supplemental Security Income (SSI). Both parties have moved for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is GRANTED and plaintiff's motion is DENIED.

## I. BACKGROUND

### A. Procedural Background

 Johnson filed an application for SSI on December 10, 2012, alleging disability since November 28, 2011. *See* Social Security Administration (SSA) Administrative Record (Dkt. No. 11) (hereinafter R._), at 252-61.[1] At the time of his application, Johnson was represented by the Law Offices of Kenneth Hiller, PLLC (the Hiller Firm). (R. 89-90, 94-95.) On March 29, 2013, Johnson's application was denied. (R. 96-99.) On April 2, 2013, Johnson requested a hearing before an Administrative Law Judge (ALJ). (R. 104.)

---

[1] The application was dated November 20, 2012, but the SSA received the application on December 10, 2012. (R. 252, 260.)

On April 10, 2014, while his application was pending, Johnson was arrested and held at the Erie County Correctional Facility. (R. 50-51, 328.) He remained incarcerated, and hence ineligible for benefits, *see* 42 U.S.C. § 402(x), until January 4, 2016. (R. 224, 249.)

On January 23, 2015, Johnson's attorneys withdrew from the case. (R. 204, 229.) After several postponements,[2] a video hearing before ALJ Sharon Seeley was held on June 29, 2015. (R. 45-78.) In addition to plaintiff, vocational expert David F. Festa testified at the hearing. (R. 70-76.)

Prior to the hearing, in a letter dated May 24, 2015, Johnson requested that the ALJ issue subpoenas for testimony and/or documents to the Hiller Firm, as well as the attorneys who represented him in three civil cases, several judges who presided over civil claims related to his detention, and the Erie County Correctional Facility Medical Department. (R. 322-29.) In her written decision, discussed below, the ALJ denied Johnson's request for subpoenas, stating that the record already contained the materials he sought. (R. 25, 50-51.) The ALJ specifically noted that Johnson's former counsel had submitted "documentation of Johnson's medical and mental health treatment records through May 21, 2014," before withdrawing from the case. (R. 25.)

On February 26, 2016, the ALJ issued a decision finding Johnson not disabled. (R. 35.) Johnson appealed the ALJ's decision, represented by Kelly Laga of the Hiller Firm. (*See* R. 250.) In a March 31, 2016 letter to the Appeals Council, Laga requested review of the ALJ's decision and "an extension of time in order to submit [plaintiff's] legal arguments or additional evidence in this case." (R. 250.) On May 12, 2016, the Appeals Council granted counsel's request for an extension and gave plaintiff 25 days to submit any additional information that was "new and material to the issues considered in the hearing." (R. 11-12.) Johnson did not submit any new

---

[2] During his incarceration, Johnson requested four postponements of his hearing. (R. 133, 153, 159-79, 182, 184-203, 205-30, 249, 328.)

2

evidence. (*See* R. 6.) On May 23, 2017, the Appeals Council denied his request to review the ALJ's decision, making that decision final. (R. 1-7.)

On July 24, 2017, Johnson filed this action, *pro se*, seeking judicial review of the ALJ's denial of his application. (Dkt. No. 2.) On December 21, 2017, the Commissioner moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings. (Dkt. No. 13.) On January 3, 2018, Johnson filed a document entitled "memorandum of law in support of the plaintiff's motion for summary judg[ment] inter alia on the pleadings" (Dkt. No. 15), which I construe as a motion for judgment on the pleadings in his favor. *See Coppedge v. United States*, 369 U.S. 438, 444 n.5 (1962) (Courts should take "a liberal view of papers filed by indigent and incarcerated defendants."). Together with his brief, Johnson attached a medical report from an unknown medical provider dated January 21, 2016, as well as four receipts from a pharmacy dated November 10 and 13, 2017, indicating purchases of naproxen, tramadol, diclofenac, and a lidocaine patch. (Dkt. No. 16.)

## B.      Personal Background

Johnson was born on February 26, 1984, making him 28 on the date of his application. (R. 272.) He received a General Education Diploma (GED) in 2006 and took some college classes in business administration. (R. 276, 367.) Between November 2011, the alleged onset of his disability, and October 2012, Johnson worked as a temporary packager and loader, hotel housekeeper, and line cook at McDonald's. (R. 57-58, 276-77, 283-86, 399.) On October 29, 2012, during his employment with McDonald's, Johnson slipped and fell in a parking lot, injuring his neck, back and head. (*See* R. 478.) He stopped working after the injury. (R. 58.)

In a Disability Report dated December 26, 2012, prepared in connection with his application for SSI, Johnson reported that he was disabled due to a lazy left eye, post-traumatic stress disorder (PTSD), back pain, and tenderness at the back of his head. (R. 275.) In a Function

3

Report dated January 16, 2013, he stated that he was unable to sit or stand for long periods of time, walk long distances, bend, or lift heavy objects due to his pain. (R. 292, 296-97.) He also reported difficulty sleeping on his back, bathing, or tying his shoes. (R. 292.) However, he was able to cook, perform household chores such as ironing, dishwashing, cleaning and vacuuming, and shop for groceries once or twice per month by himself. (R. 293-95.) With respect to his mental state, Johnson reported that he had problems paying attention, was unable to finish what he started due to headaches and dizziness, and experienced headaches, neck pain and back problems when he was under stress. (*Id.*) Johnson reported that he left his house every day in order to attend doctor visits and group counseling. (R. 292, 294, 301.)

Johnson also completed a questionnaire about his headaches. (R. 302.) He stated that he experienced headaches 10-12 times per month, 30-40 times per year, lasting 10-15 minutes each time. (*Id.*) He reported that the headaches caused him to feel dizzy, nauseous, and tense, with associated blurred vision, nausea, stress, pain, and imbalance of thought processing. (*Id.*) He took ibuprofen for the pain, which worked "[w]ithin 10 minutes" and provided relief for "1 [to] 2 hours." (*Id.*)

## II.   PLAINTIFF'S MEDICAL HISTORY

### A.   Treatment Records Relating to Plaintiff's Physical Impairments

#### 1.   Community Health Center of Buffalo

On June 26, 2012, Johnson was seen at Community Health Center of Buffalo for a routine physical examination. (R. 363-64.) He reported that "he feels good and has no complaints." (R. 363.) Upon examination, Johnson appeared "well developed," "well-nourished," and "in no acute distress." (*Id.*) His eyes were "reactive to light and accommodation." (*Id.*) His neck was "supple"

4

and had "a full range of motion." (*Id.*) Neurological examination revealed normal strength in his extremities and "intact" sensation. (R. 364.)

## 2.    Erie County Medical Center (ECMC)

On October 30, 2012, Johnson visited the emergency department of ECMC, complaining of neck, back, and head pain after his slip and fall the day before. (R. 444-47, 450.) On examination, Dr. Aaron Hilton, M.D., found tenderness over the paraspinous muscles connected to Johnson's cervical and thoracic spine, with intact sensation upon light touch and neurological strength of 4/5. (R. 446.) Dr. Hilton diagnosed muscle strain and advised Johnson to take over-the-counter pain medications such as Tylenol for relief and use a warm compress for muscle tightness or spasm. (R. 446, 450.)

Johnson returned to the emergency room on December 29, 2012, complaining of low back pain. (R. 448.) The examiner noted that Johnson was "ambulatory" with full muscle strength in the lower extremities. (R. 449.) Johnson was diagnosed with back pain. (R. 448.)

On January 6, 2014, Johnson went to the ECMC emergency room again, complaining of pain in his neck, back, and pelvis, after falling from his bike. (R. 555.) He was observed to "ambulate[] with a steady gait." (R. 555-56.) The ER doctor diagnosed neck strain but released him without any restrictions on his activities. (R. 555, 557.) Johnson attended physical therapy sessions in February and March 2014 with physical therapist Laura Morey. (R. 550-52.) Johnson reported neck pain of 7/10 in intensity, primarily because of his most recent fall, but also due to "chronic neck and back pain" from his slip and fall in 2012. (R. 550-52.) At Johnson's final session, Morey observed that Johnson had a limited range of motion in the cervical spine but full and pain-free ranges of motion in his upper extremities and full strength. (R. 550.)

5

### 3.    Chiropractic Evidence

Johnson received chiropractic treatment from Dr. Scott Croce, D.C., in November and December 2012. (R. 427-43.) Dr. Croce found a reduced range of motion in Johnson's cervical and lumber spine and noted that he was unable to perform a partial squat or walk on heels and toes. (R. 437, 442.) He assessed that Johnson had a "total" but "temporary" disability. (R. 436, 441.)

Johnson also received chiropractic treatment from Dr. John Ward, D.C., from January 16 to January 28, 2013. (R. 452-56.) Dr. Ward found a "palpable spasm of [the] paraspinal musculature with limited and painful [range of motion] of [the cervical and lumbar spine]." (R. 453.) Dr. Ward treated Johnson with joint manipulation of the cervical, thoracic, and lumbar spines and with moist heat, noting that Johnson "responded with slow improvement." (R. 454.)

### 4.    Radiographic Evidence

On October 30, 2012, a CT scan of Johnson's head and x-rays of his cervical and thoracic spine performed by ECMC were negative (normal) (R. 444-46, 511), and Dr. Hilton of ECMC noted that there was a "low likelihood of traumatic injury." (R. 447.)

On January 29, 2013, an MRI of the cervical spine, also performed by ECMC, revealed "mild straightening of the upper cervical lordosis" and focal central annular bulges at C5-C6, C6-C7, and C7-T1. (R. 457.) However, the vertebral bodies were normal in contour and signal intensity, the invertebral disc heights were preserved, the cervical cord was normal in contour and signal intensity, and there were no abnormalities detected at the craniocervical junction. (*Id.*) An MRI of the thoracic spine revealed "an s-shaped scoliosis" and "straightening of the normal thoracic kyphosis." (R. 459.) There was no evidence of disc herniation, canal stenosis, foraminal narrowing or arthritic change in either the cervical or lumbar spine. (R. 457, 459.)

6

On February 19, 2013, x-rays of Johnson's lumbar and cervical spine, taken at IMA Disability Services, were negative (normal) and showed that the "height of the vertebral bodies and intervertebral disc spaces were relatively well maintained" with "pedicles intact throughout." (R. 470-71.)

An MRI of Johnson's lumbar spine was performed on February 20, 2013. (R. 475, 479.) The MRI report itself does not appear in the record, but two workers' compensation examiners, Dr. Edward Simmons, M.D., and Dr. Zair Fishkin, M.D., later discussed its findings. Dr. Simmons observed on June 5, 2013, that the MRI showed patent central canal and neural foramen (indicating no compression), but mild to moderately increased STIR signal in the "right posterior illiac wing of uncertain etiology." (R. 475.)[3] Dr. Fishkin noted on July 1, 2013, that the MRI showed no evidence of disk herniation, spinal canal stenosis, or foraminal stenosis, but there was "concern for an underlying injury to right sacroiliac region," which required further evaluation. (R. 479.)

### B.      Opinion Evidence Related to Plaintiff's Physical Impairments

#### 1.      Consultative Examiner Dr. Hongbiao Liu

Dr. Hongbiao Liu, M.D., performed a consultative examination on February 19, 2013. (R. 466.) Dr. Liu observed that Johnson had a normal gait and stance, did not use assistive devices, and could walk on his heels and toes with mild difficulty. (R. 467.) He did not need help getting on or off the exam table and could easily rise from a chair, but could only perform a partial squat due to low back pain. (*Id.*) His joints were stable and non-tender. (R. 468.) He had no abnormality

---

[3] Short tau inversion recovery (STIR) sequences suppress the signal from fat to provide, among other things, a clearer picture of spinal abnormalities. *See* American Journal of Roentgenology, *STIR Sequence for Depiction of Degenerative Changes in Posterior Stabilizing Elements in Patients with Lower Back Pain*, https://www.ajronline.org/doi/full/10.2214/AJR.07.2829 (last visited July 31, 2018). Degenerative changes can manifest as increased signal intensity on STIR images. *Id.*

7

in his thoracic spine. (*Id.*) However, he had reduced ranges of movement in his cervical spine, with flexion/extension to 40 degrees, rotation to the left of 40 degrees and to the right of 75 degrees, and lateral rotation of 40 degrees. (*Id.*)[4] He had normal ranges of motion in the lumbar spine, except for a slightly reduced range of lateral flexion of 10 degrees. (*Id.*)[5]

Dr. Liu diagnosed Johnson with chronic neck and low back pain and PTSD (to be "further evaluated by a psychiatrist"). (R. 466, 468-69.) He opined that Johnson "ha[d] mild limitation for prolonged walking, bending, kneeling, and overhead reaching." (R. 469.)

## 2.   Workers' Compensation Examiner Dr. Edward Simmons

Dr. Simmons examined Johnson on June 5, 2013, in connection with his workers' compensation claim against McDonald's. (R. 472-76.) Johnson reported difficulty holding his head up due to neck pain, as well as difficulty sitting due to pain in his lower back. (R. 474.) During the examination, Dr. Simmons noted that Johnson "st[ood] with a guarded posture and ambulate[d] with a cautious gait pattern." (R. 475.) He had tenderness to palpation over the cervical, thoracic and lumbar spine, and coccyx and bilateral joints, reduced ranges of motion in the cervical spine, and visible paraspinal spasm when he moved his cervical spine. (*Id.*) However, Johnson had normal ranges of motion in the lumbar spine. (*Id.*) A neurological examination showed that

---

[4] Normal measurement for cervical flexion (moving the head forward) is 50 degrees, extension (moving the head backward) is 60 degrees, and lateral rotation (turning to the side) is 80 degrees. *See* Livestrong, *Normal Human Ranges of Motion*, https://www.livestrong.com/article/257162-normal-human-range-of-motion (last visited July 31, 2018).

[5] Plaintiff's lumbar spine had flexion/extension of 65 degrees and lateral flexion and rotation of 10 degrees. (R. 468.) Normal measurement of lumbar spine flexion is 40-60 degrees, extension is 20-35 degrees, lateral flexion is 15-20 degrees, and lateral rotation is 3-18 degrees. *See* Livestrong, *Normal Human Ranges of Motion*, https://www.livestrong.com/article/257162-normal-human-range-of-motion (last visited July 31, 2018); *Lumbar Spine Assessment*, https://lumbarspineassessment.wordpress.com/examination/active-range-of-motion (last visited July 31, 2018).

8

Johnson had full strength in the bilateral upper extremities, physiologic (normal) reflexes, and an intact sensation upon light touch. (*Id.*)

Dr. Simmons also reviewed previous imaging of Johnson's spine, as well as x-rays of the cervical and lumbar spine obtained that day. (R. 475.) The x-ray of the cervical spine was normal, while the x-ray of the lumbar spine revealed "facet anthropathy at L5-S1 with loss of disc height." (*Id.*) Dr. Simmons diagnosed Johnson with degenerative disc disease of the lumbar and cervical spine, muscle spasm, and spondylosis of the lumbar and cervical spine without myelopathy. (R. 476.) He also assessed that Johnson had "ongoing neck, mid and low back pain" and "a moderate to marked partial disability with regards to all work." (R. 475.)

Dr. Simmons examined Johnson again on July 29, 2013. (R. 484-88.) Johnson reported worsening pain in the buttocks and continued pain in the neck, need for more frequent repositioning, and difficulty with prolonged standing and walking. (R. 485.) Upon examination, Dr. Simmons's findings remained unchanged from the last examination. (*See id.*) Dr. Simmons noted that a new MRI of the pelvis, dated July 22, 2013, revealed no fracture lines or abnormalities associated with the sacroiliac joints, but was "consistent with mild posttraumatic edema in the bilateral iliac bones." (R. 487.) He diagnosed spondylosis of the cervical and lumbar spine without myelopathy and pelvis-contus, and assessed that Johnson "ha[d] a total disability with regards to his regular work and a moderate to marked partial disability with regards to all work." (R. 487-88.)

### 3. Dr. Azher Iqbal

Dr. Azher Iqbal, M.D., saw Johnson on September 23, 2013, to assess whether he was an appropriate candidate for bilateral sacroiliac joint injections. (R. 512-14.) Dr. Iqbal noted that Johnson walked with a normal gait and his spinal contour was normal, although he had moderate tenderness in his sacroiliac joints bilaterally and tenderness to palpation in his lumbar spine. (R.

9

513.) His range of motion was "limited in flexion and extension due to pain." (*Id.*) Dr. Iqbal diagnosed Johnson with sacral disorder and recommended sacroiliac joint injections. (R. 514.) An injection was performed on October 2, 2013. (R. 521-22.) Dr. Iqbal noted that Johnson "tolerated the procedure well without apparent complications." (R. 521.)

## 4.    Workers' Compensation Examiner Dr. Zair Fishkin

Dr. Fishkin examined Johnson on three occasions in connection with his workers' compensation claim against McDonald's. (R. 477-83, 491-509.) On July 1, 2013, Dr. Fishkin noted that Johnson was able to rise from a seated position and walk with a normal gait without assistive walking devices. (R. 480.) He observed that Johnson had full strength in his upper and lower extremities, normal range of motion in his lumbar spine, shoulders, elbows, wrists, hips, and ankles, full strength in his extremities, and a firm grip. (*Id.*) Johnson had a slightly reduced range of motion in the cervical spine, with flexion and extension of 45 degrees and lateral rotation of 60 degrees. (*Id.*)

X-rays of the cervical spine obtained on July 1, 2013 were normal, with maintenance of the cervical disc heights, no evidence of cervical instability, patent neural foramina, satisfactory bone quality, and normal alignment at C1 and C2. (R. 481.) X-rays of the lumbar spine obtained that day were also normal and showed well-maintained disc space heights, satisfactory bone quality and no evidence of spondylolysis or spondylolisthesis. (*Id.*) Dr. Fiskin "tentative[ly]" diagnosed Johnson with C5-6 disc bulge, C6-7 annulus tear, and lumbar disc bulges, and advised Johnson to continue his chiropractic treatment and take over-the-counter ibuprofen. (*Id.*)

Dr. Fishkin next saw Johnson on August 26, 2013. Plaintiff "report[ed] ongoing neck and low neck pain." (R. 506.) The results of Dr. Fishkin's physical examination remained unchanged from the last examination. (R. 507.) Dr. Fishkin diagnosed Johnson with C5-6 disc bulge, C6-7

10

annulus tear, lumbar disc bulges, and sacroiliac joint anthrosis, recommending that Johnson be evaluated for potential bilateral sacroiliac joint injections. (R. 508.)

Dr. Fishkin saw Johnson again on October 21, 2013. (R. 492.) He reported that Johnson "ha[d] responded well" to the sacroiliac joint injections he recently received. (*Id.*) However, Johnson continued to report neck pain, as well as "persistent numbness and tingling in his bilateral hands." (*Id.*) The results of physical examination remained the same. (R. 493-94.) Dr. Fishkin diagnosed Johnson with C5-T1 herniated nucleus pulpous, lumbar disc bulges, and sacroiliac joint arthrosis. (R. 494.) He reported that Johnson might be a candidate for anterior discectomy/arthrodesis. (R. 495.)[6]

After each of his three examinations, Dr. Fishkin opined that Johnson had a 50% impairment in his spine and should not lift more than 15 pounds nor engage in repetitive bending or twisting of the neck or low back. (R. 495, 502, 482.)

## C.   Treating Records Relating to Plaintiff's Psychological Impairments

### 1.   Horizon Corporations (Horizon)

Johnson intermittently sought out-patient mental health treatment from Horizon from August 2011 to January 2014. (R. 400-12, 531-48.) He began treatment at Horizon for cannabis dependence on August 22, 2011. (R. 400.) On January 31, 2012, Johnson successfully completed

---

[6] An anterior [cervical] discectomy is a procedure that involves "remov[ing] a damaged intervertebral disc from the spine in the neck, using a surgical approach from the front of the neck." The Spine Hospital at The Neurological Institute of New York, *Anterior Cervical Discectomy*, http://columbiaspine.org/treatments/anterior-cervical-discectomy-and-fusionfixation/ (last visited July 30, 2018). This surgery is often accompanied by spinal fusion (also known as arthrodesis), which involves "placing bone graft and/or implants where the disc originally was in order to provide stability and strength to the area." Spine-Health, *ACDF: Anterior Cervical Discectomy and Fusion*, https://www.spine-health.com/treatment/spinal-fusion/acdf-anterior-cervical-discectomy-and-fusion (last visited July 31, 2018); *see also* Laser Spine Institute, *What is arthrodesis?*, https://www.laserspineinstitute.com/back_problems/arthrodesis/what-is-arthrodesis/ (last visited July 31, 2018).

11

treatment (which consisted of individual and group counseling) and was discharged from services. (R. 401-402.) His Global Assessment of Functioning (GAF) score was 52 when he was admitted and 60 after he completed treatment. (R. 400.)[7]

On April 23, 2012, Johnson sought treatment at Horizon for depression. (R. 405.) He had a GAF score of 55 at admission. (*Id.*) However, he stopped attending treatment after his third session and was "unresponsive to outreach attempts." (R. 405-406.) He was discharged on July 23, 2012. (R. 405.)

Johnson sought treatment again on September 11, 2012, reporting depression, anxiety, and PTSD. (R. 411.) A treating note by Joshua Bradley, a mental health counselor, reported that at intake, Bradley "could not ascertain if [Johnson's] symptoms were malingering as his attitude was more 'poor me,' and [Johnson] had also wanted [Bradley] to let a disability lawyer know he was linked here." (*Id.*) After this initial session, Johnson "did not show up for follow up appointments, and his case was to be screened out." (*Id.*) However, before his case could be closed, Johnson made a follow-up appointment for November 7, 2012. (*Id.*) He did not attend that appointment either, reporting "he had been out all day, was tired, and didn't want to come in." (*Id.*) As a result, Horizon discharged Johnson on November 14, 2012. (409-12.)

On December 4, 2013, Johnson was referred to Horizon by the New York State Division of Parole after testing positive for cannabis. (R. 546.) The next day, Johnson was seen by Angela Roche, N.P., for an evaluation. (R. 539.) On examination, Johnson had an "appropriate" affect and

---

[7] A GAF score is used to measure an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. A score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. N.Y. Office of Mental Health, *Global Assessment Functioning*, https://apps.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf at 1-3 (last visited July 31, 2018).

behavior, normal speech pattern, and logical thought process, but poor eye contact. (R. 537.) He had fair judgment, intact memory skills and was fully oriented. (*Id.*) His GAF score was 50. (R. 536.) Nurse Roche diagnosed him with depressive disorder and cannabis dependence and prescribed Wellbutrin. (R. 536, 541.)

On February 4, 2014, Johnson was once again discharged from treatment. Horizon's discharge summary showed that Johnson decreased attendance at treatment sessions beginning in January 2014 and reported he was no longer interested in treatment. (R. 546.) The summary stated that Johnson refused to take Wellbutrin, "made no progress on treatment plan goals for addiction, social, [or] legal areas," but "made partial progress in mood . . . and physical health." (*Id.*) Johnson reported continued use of cannabis throughout the treatment period. (*Id.*)

### D. Opinion Evidence Related to Plaintiff's Psychological Impairments

#### 1. Consultative Examiner Dr. Susan Santarpia

Psychologist Susan Santarpia, Ph.D., performed a psychiatric evaluation of Johnson on February 19, 2013. (R. 462-65.) Johnson reported that he was receiving counseling at Lakeshore Behavioral Health (Lakeshore). (R. 462.) He said he had difficulty falling asleep, reduced appetite, and excessive anxiety. (*Id.*) He also reported alcohol and marijuana abuse. (R. 463.) During examination, Johnson was fully responsive and oriented. (R. 463-464.) His thought process was coherent, his mood euthymic, his sensorium clear, and his affect full and appropriate. (*Id.*) His speech was intelligible and clear. (R. 463.) His attention, concentration and memory were intact, and he had average cognitive capacity. (R. 464.)

Dr. Santarpia assessed that Johnson could "follow and understand simple instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions,

13

relate adequately with others, and appropriately deal with stress within normal limits." (R. 464.) She diagnosed Johnson with adjustment disorder (with mixed anxiety and depressed mood) but found it "controlled." (R. 465.) Based on the examination, Dr. Santarpia opined that Johnson did not have psychiatric problems "that would significantly interfere with [his] ability to function on a daily basis." (R. 464.)

## 2. State Agency Reviewer Dr. Juan Echevarria

On March 29, 2013, Dr. Juan Echevarria, Ph.D., "state agency reviewing psychologist" (R. 29), performed a review of the entire medical record. (R. 84-85.) Dr. Echevaria, who did not personally examine Johnson, found that he had no restrictions in activities of daily living, no difficulties in maintaining social functioning or concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (R. 85.) He noted that, although Johnson indicated that he had received treatment at Lakeshore, Johnson did not provide contact information for this source. (*Id.*) He observed that Dr. Santarpia found Johnson's mental status to be within normal limits and that Johnson's activities of daily living were limited "due to physical problems only." (*Id.*) He further observed that Johnson had received past treatment for substance use but had no prior record of psychiatric hospitalization and did not take psychiatric medication. (*Id.*) Based on the foregoing considerations, Dr. Echevaria opined that Johnson's psychiatric impairments were "not severe." (*Id.*)

## III. HEARING

On June 29, 2015, Johnson appeared by video at a hearing before ALJ Seeley. (R. 45.) Although the ALJ advised him of his right to a representative, Johnson chose to proceed without counsel. (R. 47-49.) Before taking Johnson's testimony, the ALJ reviewed the medical evidence of record. She asked Johnson if there were additional records, related to his condition before he

14

was incarcerated, that he thought should be added to the record. He responded, "No, Ma'am." (R. 49-51.)

Following this discussion, the ALJ examined Johnson about his impairments. Johnson testified that he obtained his GED in June 2006 and took some college classes in business administration and vocational training in residential electric. (R. 55-56.) He stated that after November 28, 2011 (the alleged onset date of his disability), he worked as a full-time assembly line worker at Durham Staffing and a hotel room cleaner at Sheraton Hotel. (R. 57-58.) Following these positions, he worked at McDonald's as a line cook from August to October 2012. (R. 58.) He left McDonald's after his slip and fall on its premises. (*Id.*)

Johnson testified that his impairments prevented him from lifting heavy objects, bending, and sitting or standing for long periods of time. (R. 59-60.) He testified that he experienced "constant headaches and migraines," "mental and physical anguish" (as a result of PTSD), and that his left eye was sensitive to light. (R. 60.) He felt constant pain in his head, neck, back and pelvic area, which was exacerbated by sitting and standing for long periods of time. (R. 61-62.) He stated that pain medication was ineffective. (R. 62.)

With respect to the treatment for his mental impairments, Johnson stated that he received counseling at Horizon, "Spectrum" (in March and April 2014), and Lakeshore (from September 2012 until January 2013). (R. 63-64.)[8] He testified that he took medication prescribed by Horizon for his mental impairments for "about three weeks," but stopped taking it because it "wasn't working" and "made [him] drowsy." (R. 65.)

---

[8] Johnson testified that he received counseling at Spectrum three to five times a week, from March to April 2014, but provided no additional information. (R. 63.) As discussed below, the SSA Administrative Record contains no treatment records from either Lakeshore or Spectrum.

15

Johnson testified that he could lift up to ten pounds, could sit for up to two hours at one time and up to four to five hours in one day, and could stand or walk for one or two hours at one time. (R. 65-67.) He experienced pain upon bending, stooping, and kneeling. (R. 67-68.) He also experienced sharp pain in his wrist when performing reaching activities because he sprained his wrist during the slip and fall. (R. 68-69.) He denied having any problems with memory or difficulties understanding oral or written instructions, making decisions, or relating to other people. (R. 69-70.)[9]

At the conclusion of Johnson's testimony, the ALJ asked vocational expert David F. Festa to identify Johnson's past work and the attendant exertional levels. (R. 72-73.) The vocational expert testified that Johnson's positions as a housekeeper at the Sheraton and as a line cook at McDonald's were unskilled and had a light exertional level. (R. 72-73.) The ALJ then asked the vocational expert to assume an individual of Johnson's age, education, with no relevant work experience, and the following limitations:

This individual can lift and carry 20 pounds occasionally, 10 pounds frequently. Same limitations for pushing and pulling. Can sit for six hours in an eight hour workday alternating after one hour to standing ten minutes. Can stand and/or walk for six hours in an eight hour workday alternating after one hour to sitting for ten minutes. Can frequently stoop, kneel, crouch or crawl. Can occasionally climb ladders, ropes or scaffolds. Frequently climb ramps or stairs and can work in an environment that does not involve exposure to extreme cold.

(R. 73.)

The vocational expert testified that the hypothetical claimant could perform the jobs of routing clerk, café attendant, and racker. (R. 73-74.)

---

[9] While Johnson testified that he had trouble "focusing," this limitation appears to be physical and not mental. Johnson testified that his eyes began to hurt when he focused on something too long. (R. 69.)

16

The ALJ then posed a second hypothetical with the limitation that the individual could only lift, carry, push, and pull ten pounds occasionally, and perform such activities with light items frequently, stand and/or walk for two hours in an eight hour workday, alternating after one hour to sitting for ten minutes, and could occasionally stoop, kneel, crouch, or crawl. (R. 74-75.) The vocational expert testified that this individual could not perform the jobs he identified in the first hypothetical but could perform the jobs of stuffer, file assembler, and table worker. (R. 75.) The ALJ then posed a third hypothetical in which the vocational expert was to assume the same limitations as in the second, but also that the individual could not engage in repetitive bending or twisting of the neck or lower back. (R. 75-76.) The vocational expert responded that this individual could not perform any work in the national economy. (R. 76.)

The ALJ then adjourned the hearing. (R. 77.)

## IV. ALJ DECISION

### A. Standards

A five-step sequential evaluation process is used pursuant to 20 C.F.R. § 416.920(a) (2012) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 18-20.) The Second Circuit has described the sequence as follows:

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

17

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4) (2012). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Therefore, to support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 416.912(f) (2015), 416.960(c) (2012).

The regulations as they existed at the time of the Commissioner's decision provide further guidance for evaluating whether a mental impairment meets or equals a listed impairment under the third step. In a "complex and highly individualized process," 20 C.F.R. § 416.920a(c)(1) (2011), the ALJ must determine how the mental impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2) (2011). The main areas that are assessed are the claimant's (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3) (2011). The first three categories are rated on a five-point scale from "none," through "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4) (2011). A "marked" limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively and on a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(c) (2015). The

18

last area—episodes of decompensation—is rated on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 416.920a(c)(4) (2011).

Furthermore, with respect to certain listed mental disorders, including affective disorders, a claimant must show in part he meets at least two of the so-called "paragraph B criteria," or one of the "paragraph C criteria." The paragraph B criteria at the time of the Commissioner's decision included: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *See, e.g.*, 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B) (2015) (affective disorders). The paragraph C criteria for affective disorders required a showing of: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *See, e.g.*, 20 C.F.R. § Pt. 404, subpt. P, app'x. 1 § 12.04(C) (2015).

If a mental disorder does not qualify as a listed impairment under the regulations, it may still qualify as a disability if the claimant's RFC does not allow him to perform the requirements of his past relevant work, and if the claimant's limitations, age, education, and work experience dictate that he cannot be expected to do any other work in the national economy. 20 C.F.R. § 416.920(e) (2012). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 416.920(e) (2012), 416.945(a)(3) (2012).

19

Finally, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do, given his RFC. 20 C.F.R. § 416.960(c)(2) (2012). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. Pt. 404, subpt. P, app'x 2 (2008), typically guide this evaluation, placing claimants with exertional limitations into categories according to their RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(g) (2012). However, "[u]nder the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

## B.      The ALJ's Decision

At step one, the ALJ found that Johnson had not engaged in substantial gainful activity since December 10, 2012. (R. 27.)

At step two, the ALJ found that Johnson suffered from the following "severe" impairments: (i) herniated disc at C5-T1, (ii) facet anthropathy of L5-S1, (iii) anthrosis of the S1 joint and lumbar spine. (R. 28.) With respect to Johnson's mental impairments, the ALJ determined that Johnson's "adjustment disorder with mixed anxiety and depressed mood, and marijuana abuse, considered singly and in combination," were non-severe. (*Id.*) In reaching this conclusion, the ALJ noted that Johnson had "minimal mental health treatment" because he repeatedly missed appointments and treatment sessions, and that although Johnson reportedly received counseling at Spectrum in March and April 2014, "such a brief period of counseling" would not support his alleged mental limitations. (*Id.*) The ALJ also found that, although Johnson testified that he received counseling at Lakeshore, that testimony "appears to be an error" because "the record reflects only the

20

treatment at Horizon." (*Id.*) The ALJ noted that consultative examiner Dr. Santarpia found that Johnson "was able to engage in simple work-related activities, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress." (R. 28-29.) The ALJ also noted that state agency review psychologist Dr. Echevarria found Johnson's psychiatric impairment to be non-severe after reviewing the medical record. (R. 29.)

Relying primarily on Johnson's Function Report and his report to Dr. Santarpia, the ALJ additionally noted that there was no evidence that Johnson had any limitations in activities of daily living, social functioning, or concentration, persistence or pace, and that he had no documented episodes of decompensation of extended duration. (R. 29.)

At step three, the ALJ found that Johnson's severe physical impairments did not meet or medically equal the severity of a listed impairment. (R. 30.) The ALJ specifically considered Listing 1.04 (disorders of the spine) and found that the record did not establish any of the Listing criteria. (*Id.*)

At step four, the ALJ found that Johnson had the RFC to perform light work as defined under 20 C.F.R. § 416.967(c), except that Johnson could climb ladders, ropes or scaffolds only occasionally; must be permitted to alternate after sitting one hour to standing 10 minutes while remaining on task; must be permitted to alternate after standing and/or walking one hour to sitting 10 minutes while remaining on task; and should have no exposure to extreme cold. (R. 30.)

The ALJ acknowledged that Johnson's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (R. 31.) However, the ALJ found that Johnson's statements about the intensity, persistence and limiting effects of his symptoms were

not supported by the "objective medical evidence." (R. 31, 34.) In reaching this conclusion, the ALJ weighed the opinion evidence in the record.

The ALJ assigned "no weight" to the opinions of workers' compensation examiner Dr. Simmons that Johnson had a "total disability" for his regular work and a "moderate to marked partial disability," because these opinions "do not state specific functional limitations." (R. 33.) She also assigned "no weight," for the same reason, to the October 2013 conclusion of workers' compensation examiner Dr. Fishkin that Johnson had a 50% temporary impairment. (*Id.*)

The ALJ assigned "more weight" to Dr. Fishkin's July 2013 and October 2013 opinions, stating that Johnson was "limited to lifting 15 pounds and no repetitive bending or twisting of the neck or low back," but determined that the opinion could not be given "great weight" because it was not "consistent with Dr. Fishkin's own examination on those dates." (*Id.*)

The ALJ assigned "greater weight" to consultative examiner Dr. Liu's opinion that Johnson had only a "mild limitation . . . for prolonged walking, bending, kneeling and overheard reaching" because it was "based on an in-person examination" and was "consistent with Dr. Fishkin's examinations of the claimant and the record as a whole." (R. 34.)

At step five, relying on the vocational expert's hearing testimony, the ALJ concluded that Johnson had the RFC to perform a significant number of jobs in the national economy, including routing clerk, café attendant, and racker. (R. 34-35.)

The ALJ concluded that Johnson was not disabled within the meaning of the Act. (R. 35.)

## V.   ANALYSIS

### A.   Standards

Where, as here, the Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), she must establish that no material facts are in dispute and that she is entitled to

judgment as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at \*1 (S.D.N.Y. Jan. 11, 2017). The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Thus, the reviewing court may set aside a decision of the Commissioner only "if it is based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at \*1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at \*6 (S.D.N.Y. May 27, 2009)); *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at \*8 (S.D.N.Y. Apr. 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at \*8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi v. Astrue*, 2009 WL 50140, at \*21 (S.D.N.Y. Jan. 7, 2009) (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), and *Williams v. Bowen*, 859 F.2d 255, 256 (2d Cir. 1988)).

Where the ALJ fails to provide an adequate "roadmap" for her reasoning, remand is appropriate. *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence"). Where the ALJ adequately explains her reasoning, however, and where her conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a

*de novo* review. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.") (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)) (emphasis in original); *Cleveland v. Apfel*, 99 F. Supp. 2d 374, 379 (S.D.N.Y. 2000) ("This Court may not substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a *de novo* review.") (citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).

Johnson makes two arguments to this Court. First, he contends that he met his burden of proof ("satisfied his diagnosis of disability's") at steps 1 through step 4. Pl. Mem. (Dkt. No. 16) at 5. Second, he argues that at step 5, the Commissioner erred in determining that there was work in the economy that he could perform. *Id.* For the reasons set forth below, I conclude that Johnson did not meet his burden to show that he was disabled during the relevant time period, and that the ALJ's determination that Johnson was not disabled was supported by substantial evidence.

## B.    Duty to Develop the Record

Before addressing Johnson's arguments, I must first determine whether the ALJ satisfied her threshold duty to develop the record. After carefully reviewing the record, I am satisfied that the ALJ satisfied this duty. In the Second Circuit, an "ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alteration in

24

original) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* at 112-13 (citation omitted) (alteration in original). In the case of *pro se* litigants, the ALJ's duty to develop the record is "heightened." *Id.* at 113 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir.1990)). "The ALJ must 'adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered' and by 'scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts.'" *Id.* (alterations in original) (citation omitted).

However, the duty to develop the record is "not absolute," and requires "the ALJ only to ensure that the record contains sufficient evidence to make a determination." *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). The record contains sufficient evidence if it is "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability." *Sanchez v. Colvin*, 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015) (citations omitted); *see also Bussi*, 2003 WL 21283448, at *8 ("[T]he ALJ must obtain additional information . . . when the evidence as a whole is not complete enough for the ALJ to make a determination.") (quoting *Perez v. Chater*, 77 F.3d 41, 47-48 (2d Cir. 1996). An ALJ's determination may be upheld where the record is "adequate to permit an informed finding." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

Here, the record contains sufficient evidence to permit the ALJ to make "an informed finding" regarding Johnson's physical and mental impairments. With respect to Johnson's physical impairments, the record contains extensive treating notes from Johnson's June 2012 general physical examination (approximately seven months after the alleged onset of his impairments) (R. 363-64), notes from Johnson's emergency room visits (including notes from one day after

Johnson's slip and fall on October 29, 2012) (R. 444-51, 554-57), and chiropractic treatment notes between November 2012 and January 2013 (R. 427-43, 452-56). The record also contains various x-ray and MRI reports regarding Johnson's cervical, thoracic and lumbar spines (R. 444-45, 470-71, 511), as well as opinions from four physicians who personally examined him: Dr. Azher Iqbal, who oversaw Johnson's sacroiliac joint injection (R. 521), worker's compensation examiner Dr. Fishkin, who examined Johnson on July 1, August 26, and October 21, 2013 (R. 478-83, 592-96, 498-509), worker's compensation examiner Dr. Simmons, who examined Johnson in June and July 2013 (R. 473-76, 485-88), and consultative examiner Dr. Liu, who examined Johnson on February 19, 2013. (R. 466-69.)

With respect to Johnson's mental impairments, the record includes treating notes from Horizon from August 2011 to January 2014 (R. 400-12, 532-24), the opinion of Dr. Santarpia, who performed a psychiatric consultative examination on February 19, 2013 (R. 462-65), and the March 29, 2013 opinion of state agency reviewer Dr. Echevarria. (R. 84-85.)

Moreover, the ALJ appropriately developed Johnson's testimony during his hearing. She reasonably explained the medical records in the file and asked Johnson if there was additional evidence that needed to be obtained (which he denied). (R. 50-54.) The ALJ then identified the impairments that Johnson alleged in his application. (R. 59.) She questioned Johnson about how each of the impairments kept him from working, whether and to what extent each impairment had worsened since the date of his application (R. 58-62), the treatment for each of the impairments (R. 62-64), and the side effects of any medication. (R. 62, 65.) She then asked Johnson about his alleged exertional and non-exertional limitations related to his physical and mental impairments. (R. 65-71.)

26

I conclude that the ALJ's failure to obtain treating notes from Lakeshore and Spectrum pertaining to additional treatment that Johnson may have received for his mental conditions is inconsequential. At the hearing, Johnson testified that he received counseling at Spectrum in March and April 2014, and at Lakeshore from "around September" 2012 to "possibly" January 2013. (R. 63-66.)[10] In her decision, the ALJ dismissed Johnson's testimony that he received counseling at Lakeshore as "an error" because "the record reflects only the treatment at Horizon." (R. 28.) With respect to Spectrum, she concluded that "such a brief period of counseling would not support the claimant's allegations regarding limitations due to his mental impairments" given "the longitudinal record including records of treatment at Horizon as recently as January 2014." (R. 28.)

First, the ALJ does not have any obligation to obtain missing records merely because of a "theoretical possibility" that such records exist. *Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) (summary order); *see also Dutcher v. Astrue*, 2011 WL 1097860, at \*5 (N.D.N.Y. Mar. 7, 2011) ("Plaintiff cannot simply identify arguable gaps in the administrative record and claim that these gaps are a *per se* basis for remand."). In his Disability Report dated December 26, 2012, Johnson reported receiving mental health treatment only at Horizon. (R. 278-81.) Similarly, he did not mention Lakeshore in his disability report appeal form dated April 2, 2013 (R. 305-306), which would be odd if, as he later testified, he was treated at Lakeshore from September 2012 to January 2013. Moreover, Johnson was given an opportunity to submit additional treatment records to the Appeals Council but did not do so. (R. 11, 12, 250.) Additionally, as noted above, Johnson only

[10] The record does not contain any other reference to Johnson's counseling at Spectrum. Prior to the hearing, Johnson told Dr. Santarpia that he had received counseling at Lakeshore, with "Jose," which was "helping him a great deal." (R. 462.) However, as Dr. Echevaria later noted, Johnson "did not provide contact information for this source." (R. 85.)

27

mentioned Spectrum once – at the hearing – and never provided any contact information for Lakeshore. Consequently, it is not at all clear that there are missing treatment notes from these providers.

Second, because the ALJ had more than two years of treatment notes from Horizon and the in-person examination by Dr. Santarpia on February 19, 2013, which fell directly within the time frame of Johnson's reported treatment at Lakeshore and Spectrum, and because those records "cover[ed] each possible [mental] impairment, none of which corroborate [Johnson's alleged] mental limitations," it is unlikely that the treating records from Lakeshore or Spectrum, if any, would have changed the ALJ's conclusions about Johnson's mental impairments. *See Morris*, 721 F. App'x at 28 (quoting *Carvey v. Astrue*, 380 F. Appx. 50, 51 (2d Cir. 2010) (summary order)) ("[B]ecause the record evidence was adequate to permit the ALJ to make a disability determination, we identify no merit in [the] claim that the ALJ was obligated *sua sponte* to recontact the treating physician[ ]."). The Horizon records provide substantial evidence in support of the ALJ's conclusion that Johnson's mental impairments were non-severe. *Morris*, 721 F. App'x at 28 (where medical record contained notes from plaintiff's treating physician spanning the time period in which plaintiff alleged that "her condition deteriorated significantly," as well as assessments and notes from other physicians that covered "each possible impairment," substantial evidence supported the ALJ's decision).

Dr. Santarpia's February 19, 2013 examination found Johnson to be fully responsive and oriented, with coherent thought process, euthymic mood, clear sensorium, full and appropriate affect, intact attention, concentration and memory, and average cognitive capacity. (R. 463-64.) Similarly, the Horizon reports contain no evidence that Johnson expressed or displayed more than mild symptoms. (*See* R. 400-12, 532-48.) For example, Nurse Roche's examination on December

5, 2013 found that Johnson had appropriate affect and behavior, a normal speech pattern, logical thought process, fair judgment, intact memory skills, and was fully oriented. (R. 537, 542.) Although Johnson's GAF scores were repeatedly found to be within the median range, which suggested moderate symptoms (R. 400, 405, 536), the ALJ was within her discretion to discount these scores because they were "of limited use in evaluating an individual's [RFC]" and "based on a brief initial evaluation period, not a lengthy treating relationship." (R. 34.) Moreover, Johnson himself testified that he did not have any limitations with respect to his memory or focus, or any problems understanding oral and written instructions, making decisions, or relating to other people. (R. 69-70.) Therefore, the ALJ sufficiently developed the record to make an informed determination regarding Johnson's mental impairments.

## C.      The ALJ's RFC Determination Was Supported by Substantial Evidence

I conclude that the ALJ's RFC determination is supported by substantial evidence. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). However, the ALJ's determination may be set aside "only if the factual findings are not supported by substantial evidence." *Burgess v. Astrue*, 537 F.3d at 127 (quotation marks and citation omitted). The reviewing court may not reweigh the evidence. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.*; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

ALJ Seeley found that Johnson retained the RFC to perform less than a full range of light work, as defined in 20 C.F.R. § 416.967(b). (R. 30.) Specifically, the ALJ found that Johnson is able to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, sit six hours in an eight-hour workday, alternating after one hour to standing for 10 minutes while remaining on task, stand and/or walk six hours in an eight-hour workday, alternating after one hour to sitting for 10 minutes while remaining on task, and was able to frequently stoop, kneel, crouch or crawl, frequently climb ramps or stairs, and occasionally climb ladders, ropes or scaffolds, and must avoid exposure to extreme cold. (*Id.*) Applying the "very deferential" standard required here, *Brault*, 683 F.3d at 448, I cannot conclude that a reasonable factfinder would be required to reach a different conclusion.[11]

The ALJ determined the foregoing RFC after reviewing the opinion evidence and assigning various weights to the opinions of four examining physicians and a state agency reviewer: consultative examiner Dr. Liu; worker's compensation examiners Dr. Simmons and Dr. Fishkin; consultative examiner Dr. Santarpia; and stage agency reviewer Dr. Echevarria.

An ALJ is required to consider five factors in assigning the weight she gives to any medical opinion. 20 C.F.R. § 416.927(c)(1) (2012). These factors include the (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the

_____

[11] The ALJ's failure to reach a determination regarding Johnson's headaches, "lazy eye" or "tenderness in the back of the head" provides no basis for remand because there is no evidence in the record that Johnson had any limitation or restriction caused by these impairments. "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8P, 1996 WL 374184, at *3; *see also Vasquez v. Berryhill*, 2017 WL 1592761, at *21 (S.D.N.Y. May 1, 2017) (finding that failure to include functional limitations absent any record that "describes in any detail the severity of these conditions or their impact on Vasquez's ability to function" was not error).

30

consistency of the opinion with the remaining medical evidence; (4) whether the physician is a specialist; and (5) any other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 416.927(c)(1)-(c)(6) (2012). Although an ALJ must "always" consider the medical opinions in the record with the rest of the relevant evidence, 20 C.F.R. § 416.927(c) (2012), the ultimate opinion as to whether the claimant is disabled is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1) (2012). Applying these requirements, the Court cannot conclude that the ALJ erred in the weight she assigned to the opinion evidence in the record.

With respect to Johnson's alleged physical impairments, the ALJ did not err in failing to assign any weight to Dr. Simmons's June 2013 assessment that Johnson had "a moderate to marked partial disability with regards to all work," and his additional assessment on July 2013 that Johnson had a "total disability with regards to his regular work," because a doctor's opinion that a claimant is "disabled" (particularly for purposes of a different statute) is not controlling. *See* 20 C.F.R. § 416.927(d)(1) (2012); *Guerrero v. Comm'r of Soc. Sec.*, 2016 WL 7339114, *20 (S.D.N.Y. Dec. 19, 2016) ("the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner") (internal quotation marks and citation omitted)), *report and recommendation adopted*, 2017 WL 4084051 (S.D.N.Y. Sept. 13, 2017); *Ackley v. Colvin*, 2015 WL 1915133, at *5 (W.D.N.Y. Apr. 27, 2015) ("the ALJ correctly noted that the determination of disability in the context of workers' compensation claim uses a different standard than the Social Security Act"); *Davis v. Astrue*, 2010 WL 2777063, at *4 (N.D.N.Y. June 17, 2010) ("the ALJ properly discounted Dr. Brosnan's opinions that Plaintiff was unable to work because they were rendered for a Workers' Compensation claim"), *report and recommendation*

*adopted*, 2010 WL 2777947 (N.D.N.Y. July 14, 2010); *see also Trancynger v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 106, 119 (S.D.N.Y. 2017) (collecting cases).

In addition, as the ALJ noted in other portions of her opinion, Dr. Simmons's opinions were inconsistent with Johnson's own statements that he was able to shower, bathe, and dress daily, perform household chores such as ironing, dishwashing, cleaning and vacuuming without help, and walk outside every day. (R. 29; *see* R. 292-96.) They were also inconsistent with Dr. Fishkin's generally benign examination findings, which concluded that Johnson had a normal gait, full strength in the extremities, firm grip, normal range of motion in the shoulders, elbows, wrists, hips, ankles and lumbar spine, and intact sensation. (*See* R. 480-481.)

For similar reasons, the ALJ did not err in giving no weight to Dr. Fishkin's assessment that Johnson had a "50% temporary impairment" and giving only limited weight to Dr. Fishkin's later opinion that Johnson was limited to lifting 15 pounds and could not engage in repetitive bending or twisting of the neck or lower back. (R. 33, 477-83, 491-509.) Dr. Fishkin's opinion as to the extent of Johnson's disability was rendered for purposes of a different statute, cannot be controlling upon the Commissioner, and in any event is inconsistent with his own benign findings discussed above. (R. 33.)

Finally, the ALJ did not err in giving "greater weight" to Dr. Liu's opinion that Johnson had "a mild limitation . . . for prolonged walking, bending, kneeling and overhead reaching." (R. 33-34; R. 469.) The ALJ correctly noted that the opinion was "based on an in-person examination" and was generally more consistent with the entire record (including Dr. Fishkin's examination findings). (R. 34.)

With respect to Johnson's mental impairments, the ALJ gave "great weight" to the opinions of consultative examiner Dr. Santarpia and state agency reviewer Dr. Echeverria that Johnson did

32

not have severe psychiatric problems that would impede his daily functioning, because these opinions were "consistent with the record as a whole." (R. 34.) The record relating to Johnson's treatment for his mental health impairments and Johnson's own testimony support this determination. Specifically, Johnson reported that he performed his activities of daily living without help, socialized with family and friends, attended school, performed simple mathematical calculations, and had no episodes of decompensation. (R. 29; *see also* R. 85, 464.) Johnson also testified that he had no limitations with respect to his memory or focus, and no problems understanding oral and written instructions, making decisions, and relating to other people. (R. 69-70.) In addition, the ALJ properly noted that Johnson "received minimal mental health care during the relevant period." (R. 28-29, 34.) The Court further notes that Johnson was employed for nearly one year after his alleged onset date and testified that he only left this employment because of his slip and fall injury, not because of his mental impairments. (R. 58.)

After weighing the opinion evidence, the ALJ determined that Johnson's subjective complaints were "less than fully credible" because "the objective medical evidence does not support the alleged severity of the symptoms." (R. 34.) This was not in error.

While an ALJ may not reject a claimant's statements about "the intensity and persistence of [his] pain" or about the effect of his symptoms on his ability to work "solely because the available objective medical evidence does not substantiate [his] statements," *Valdez v. Colvin*, 232 F. Supp. 3d 543, 552 (S.D.N.Y. 2017) (quoting 20 C.F.R. §§ 404.1529(c), 416.929(c)), she may discredit the claimant's statements "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility," *id.* (internal quotations and citations omitted), including significant inconsistencies in the claimant's presentation of his own symptoms or capabilities. *See, e.g.*, *Genier*, 606 F.3d at 50 (an ALJ is "required to consider all of the evidence

33

of record," including the claimant's "testimony and other statements with respect to his daily activities"). The factors that are relevant in assessing credibility include: (i) daily activities; (ii) location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of medication; (v) treatment other than medication used for relief of pain or other symptoms; (vi) any measures used to relieve pain or other symptoms, and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3) (2011).

When an ALJ rejects a claimant's testimony about his impairments as not credible, she must set forth the basis for that finding "with sufficient specificity to permit intelligible plenary review of the record." *Valdez*, 232 F. Supp. 3d at 552 (quoting *Williams*, 859 F.2d at 260-61). If the ALJ complies with that requirement, her credibility determination "is generally entitled to deference on appeal." *Id.* at 553 (quoting *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013)). Accordingly, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Id.* (quoting *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)).

Here, the ALJ gave specific reasons for her credibility determination. In addition to noting that Johnson's complaints were not supported by the "objective medical evidence" (R. 34), she explicitly noted Johnson's activities of daily living, and the duration, frequency, and intensity of his symptoms. (R. 31.) She noted that Johnson attended school and maintained social relationships. (R. 29.) She also considered Johnson's relatively mild treatment, consisting of over-the-counter pain relievers, chiropractic manipulations, physical therapy, and a sacroiliac injection (which Johnson tolerated well). (R. 32-33); *see* 20 C.F.R. § 416. 929(c)(3) (iv)-(vi), as well as the treating

34

notes and radiographic evidence, which generally showed normal or mild findings. (R. 31-32.) Based on the foregoing considerations, the ALJ reasonably concluded that Johnson's subjective complaints were "not fully credible." (R. 29.) Having carefully reviewed the record and the ALJ's decision, and having concluded that the weight she assigned to the opinion evidence was appropriate and her credibility determination was proper, the Court concludes that substantial evidence supports the ALJ's RFC decision.

## D.     The ALJ's Vocational Determination

I further conclude that the ALJ appropriately relied on the testimony of the vocational expert to determine that Johnson could perform other work in the national economy considering his age, education, and work experience. (R. 27.) *See Lacava*, 2012 WL 6621731, at *18 ("[An] ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden."). At the hearing, the ALJ posed three hypotheticals to the vocational expert to determine the jobs that a hypothetical claimant with Johnson's RFC could perform. (R. 73-77.) Relying on the vocational expert's testimony, the ALJ concluded that Johnson could perform the occupations of routing clerk, café attendant, and racker, and that these jobs existed in significant numbers in the national economy. If an ALJ adopts the vocational expert's testimony, the recitation of the claimant's functional abilities set forth in the ALJ's decision should match his questions to the vocational expert at the hearing. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1984). Here, the RFC matched the hypothetical provided to the vocational expert. (R. 35, 73-74.) Consequently, the ALJ did not err in relying on this testimony.

## E.     Additional Evidence Submitted by Plaintiff Does Not Require Remand

In support of his motion in this Court, Johnson attaches a report dated January 21, 2016, from an unknown treatment provider, who noted that Johnson "suffered significant injuries to the

35

spine" and diagnosed him with C5-T1 HNP, lumbar disc bulges, and sacroiliac joint arthrosis. (Dkt. No. 16-3), at 1. Johnson also attaches four receipts from a pharmacy, dated November 10 and November 13, 2017, indicating purchase of naproxen, tramadol, diclofenac and a lidocaine patch. *Id.* at 2.

"Evidence that postdates an ALJ's decision is not irrelevant per se." *Mulrain v. Comm'r of Soc. Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011). The district court may remand a case to the Commissioner for the consideration of evidence that post-dates the determination if it is "material" to the determination and where "good cause for the failure to incorporate such evidence into the record in a prior proceeding" is shown. 42 U.S.C. § 405(g). Evidence is material if it is relevant to the plaintiff's condition during the time period for which benefits were denied, it is probative of that condition, and there is "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *See Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004).

The Court finds that the additional evidence Johnson provided does not provide a basis for remand because it is not material. First, Johnson's November 2017 prescriptions are not probative of Johnson's condition during the relevant period, and there is no basis to conclude that the prescriptions would have influenced the ALJ to decide his application differently. Similarly, the January 2016 medical report is not new or probative of Johnson's condition. It contains substantially the same information as Dr. Fishkin's three reports (R. 478-83, 592-96, 498-509), which the ALJ reviewed and weighed accordingly. There is no basis to conclude that this evidence (even if properly authenticated) would lead the ALJ to decide Johnson's claims differently.

## VI. CONCLUSION

For the reasons set forth above, the Commissioner's motion is GRANTED, plaintiff's

motion is DENIED, and the case is DISMISSED.

Dated: New York, New York
    July 31, 2018

                    SO ORDERED.

                    **BARBARA MOSES**
                    **United States Magistrate Judge**

37